**Affirmed and Memorandum Opinion filed June 3, 2014.**



In The

# Fourteenth Court of Appeals

## NO. 14-12-00678-CR
## NO. 14-12-00679-CR

**MARVIN LEE WATTS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 230th District Court**
**Harris County, Texas**
**Trial Court Cause Nos. 1333900 & 1333901**

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant Marvin Lee Watts of two counts of aggravated sexual assault of a child less than fourteen years of age and sentenced him to prison for seven years in each case. The trial court ordered the sentences to run consecutively. Appellant brings this appeal claiming the evidence is insufficient and he received ineffective assistance of counsel. We affirm.

# I.   SUFFICIENCY OF THE EVIDENCE

In his first issue, appellant contends the evidence is legally and factually insufficient to support his conviction. Since the Court of Criminal Appeals' decision in *Brooks v. State*, 323 S.W.3d 893, 894–95, 912–13 (Tex. Crim. App. 2010) (4–1–4 decision), the legal-sufficiency standard set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979), is the only standard that we apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt. *See Griego v. State*, 337 S.W.3d 902, 903 (Tex. Crim. App. 2011); *Brooks*, 323 S.W.3d at 894–95, 912–13. Accordingly, we will review only appellant's challenge to the legal sufficiency of the evidence.

## A.   The Testimony

The complainant, I.W.,[1] testified the first occurrence of sexual abuse occurred in September of 2011, when she was twelve years old.  Appellant was her mother's fiancé and lived in the home with I.W. and her younger siblings, two sisters and a brother, appellant's son.  I.W. stayed home from school that day because she needed a tetanus shot and appellant took her to get the shot. Afterward, they were watching a movie in the living room when appellant asked her to go to his room to watch a movie.  It was the first time that he invited her to watch a movie in the bedroom alone; normally her sisters and/or her mother would be present.  While they were lying in bed, appellant took her hand and made her touch his penis.  I.W. testified he then made her perform oral sex on him. Appellant put his hands on her head and forced her to put his penis inside her mouth.  Appellant made her head go up and down.  I.W.'s testimony indicates that appellant did not ejaculate in her mouth, but just stopped.

---

[1] On appeal, we will use only the complainant's initials.

The following weekend, I.W.'s mother left early in the morning and then her two sisters left the house. I.W.'s little brother was in his room when appellant came into her room; she was lying on her bed. He pulled his penis out of his pants, leaned over her, told her to open her mouth, and put it in her mouth. Appellant moved his penis in and out of her mouth. Appellant then took his penis out of her mouth and ran to the bathroom. I.W.'s testimony reflects that appellant did not ejaculate in her mouth.

Later that same day, I.W. and her sisters were leaving appellant's room when appellant called her, closed the door to the bedroom, led her into the bathroom, and closed the door. Appellant told her to pull down her pants, got "some kind of [v]aseline [sic] out of the cabinet and rubbed it on his private parts." Appellant had her bend over and put his penis in her anus.[2]

I.W. testified that the next time appellant made her perform oral sex and had anal intercourse with her. On the following occasion, appellant put his penis in her vagina. Appellant called her into his room and after having anal intercourse with her, appellant told her to lay down on the bed. He leaned over her and put his penis in her vagina. Appellant moved up and down, and something "watery and white" came out of his penis and was on her legs. I.W. testified that she had never seen it before but had learned at school that it was sperm. Appellant went to the bathroom, grabbed a towel, and closed the door.

The last time, appellant made her perform oral sex again. He made her head go back and forth until she tasted something and he stopped, grabbed a towel, and started wiping his penis. I.W. went to her room and spit in her trash can. She went to get some Kool-Aid and as she was walking back to her room, he took her into the bathroom. Appellant sat on the toilet and pulled out his penis. He asked her to

[2] I.W. used the term "butt" and stated that she knew it was anal sex.

3

sit down on him but then he could not get his penis in her anus. Appellant had her turn around and wrapped her legs around him. Appellant told her to guide it in, but she did not—she only appeared to try—and appellant's penis contacted her vagina. Appellant left and took a shower.

I.W. confided to some friends at school that she was being sexually abused. They encouraged her to tell someone. I.W. told her sister and then her mother.

On the following morning, Agent Chadwick[3] met I.W. and her family at the church where he was working an extra security job. I.W.'s mother, Celicia Simons, appeared distraught and asked Agent Chadwick if he was a police officer. He said yes and she told him that her daughter had been sexually assaulted. Simons told Agent Chadwick that appellant was the suspect. Agent Chadwick led the family members inside the church and separated them.

I.W. provided her name and date of birth to Agent Chadwick; he noticed her demeanor changed when she was separated from appellant. I.W. revealed she had been sexually assaulted several times. Agent Chadwick noted that appellant was calm and collected; appellant told Agent Chadwick that I.W. had fabricated the allegations because she was upset over having to do household chores.

Agent Chadwick referred the case to HPD Sex Crimes and Simons agreed to take I.W. to the hospital for an examination. Agent Chadwick was uncomfortable leaving I.W. in appellant's company, but Simons insisted the family would stay together. Agent Chadwick did not believe Simons was very sympathetic to I.W. and noticed how loyal she appeared to appellant.

I.W. had a medical exam later that day at Texas Children's Hospital. Shannon Frost, a certified sexual assault nurse examiner, testified that I.W. said

---

[3] Chadwick is an agent of the Texas Alcoholic Beverage Commission.

4

appellant made her touch his penis, put his penis "in her front and back," made her put her mouth on his penis, and touched her breasts with his mouth. I.W. told Jones this happened two or three times. Jones found no injuries and testified that was not surprising. She explained that penetration of the vagina or the anus could occur without causing injury. Further, Jones testified that the lack of injuries did not establish none ever existed. In her experience, the majority of patients had no injuries and in the case of a delayed outcry, none were expected. Frost observed Simons was supportive of appellant, but not of I.W.

I.W. was interviewed the following day at the Children's Assessment Center by Stephanie Jones. Jones testified I.W. was able to tell the difference between the truth and a lie. As the outcry witness, Jones testified to what I.W. told her during the interview. During the interview, I.W. told Jones that her mother's fiancé, appellant, had sexually abused her in September and October. Jones's testimony as to what I.W. told her was not entirely consistent. Jones conceded that she was confused and her testimony about what I.W. told her happened during the first encounter, and what I.W. had actually told her, were different. The video recording of I.W.'s interview with Jones was admitted into evidence and during appellant's testimony it was published to the jury. The video reflects that during the interview I.W. told Jones that appellant made her touch his penis, forced his penis into her mouth, and forced his penis inside her vagina.[4]

At trial, I.W. testified she had known appellant for about two years and her relationship with appellant was not good. She said that she "never liked him, because of his age and [her] mom going out with him."[5] According to I.W. her

---

[4] Because the jury could find all the essential elements of both offenses beyond a reasonable doubt from I.W.'s testimony at trial, it is unnecessary to detail either Jones's testimony or the contents of her interview with I.W.

[5] Appellant testified at trial that he was nineteen and Simons was 32.

mother was responsible for disciplining her, not appellant. I.W. testified that any "big" fights with appellant started after the abuse occurred and they occurred because she was disrespectful toward him. I.W. testified that appellant has a tattoo on his left wrist that is her name.

Dr. Thompson of the Children's Assessment Center testified that while it is common for children to outcry immediately when they are sexually abused, in more cases than not there is a delay of disclosure, sometimes even just days or weeks. According to Dr. Thompson, it is uncommon for a child to tell everything that happened the first time they outcry. He stated that as time goes by, and sometimes as part of treatment, the child is more comfortable and shares more about everything that has happened. Dr. Thompson identified this concept at "partial disclosure" and testified it is "not so much inconsistencies as them being able to say more or less at a given time about what happened to them or even being able to recall more or less at a given time . . . ." Dr. Thompson also testified that getting a tattoo of the child's name could be grooming.

Appellant testified that he took I.W. for her tetanus shot but denied touching I.W. in any way. He watched television and I.W. went to her room. Appellant testified that the night I.W. alleged he had touched her, she was being disrespectful toward him. Simons, I.W.'s mother, was talking to her and one of her sisters about punishment when I.W. said appellant had been touching her. Appellant stated he never heard any specific allegations as to time, place, or what happened. He denied it and wanted to go to the hospital; they decided to go the next day. In the morning, they went to the church. Simons immediately started talking to Agent Chadwick. Agent Chadwick talked to him and he denied anything had happened.

Appellant testified that on October 2, they went to Golden Corral after church. They returned home around 1:00 p.m. On October 8, the children went to

a banquet with their grandmother. Afterwards, they went to a birthday party and came home about 10:00 p.m. On October 9, the children went with Simons's stepmother until they picked Simons up from her community service; they came home about 6:00 p.m. Appellant testified that on the weekends of October 1st and 2nd, and October 8th and 9th, while Simons was at community service, he was taking care of the children. Appellant denied that any of the incidents described by I.W. happened.

Appellant showed the jury the tattoo of I.W.'s name. He testified that he had the names of all his children tattooed on his body and showed the jury two other tattoos bearing the names of his other children. According to appellant, he already had a tattoo that included I.W.'s last name and he put her first name in front of it because her mother asked; it was done about "a year ago."

On cross-examination, appellant said Agent Chadwick "was lying" when he testified that appellant did not press him for details about I.W.'s allegations. Appellant admitted that he told Agent Chadwick he could explain why I.W. was making these allegations, but he told Jones that he could not.

B.    Analysis

Appellant claims conflicts in I.W.'s testimony and her delayed outcry render the evidence insufficient to support his conviction. When evaluating the legal sufficiency of the evidence, we view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319 (1979); *Drichas v. State*, 175 S.W.3d 795, 798 (Tex. Crim. App. 2005). The standard is the same for both direct and circumstantial evidence cases. *King v. State*, 895 S.W.2d 701, 703 (Tex. Crim. App. 1995). We do not resolve any conflict of fact, weigh any evidence, or evaluate the credibility of any

7

witnesses, as this is the function of the trier of fact. *See Adelman v. State*, 828 S.W.2d 418, 421 (Tex. Crim. App. 1992). In conducting our review, we resolve any inconsistencies in the evidence in favor of the verdict. *Crawford v. State,* 889 S.W.2d 582, 584 (Tex. App.—Houston [14th Dist.] 1994, no pet.).

It is the role of the jury to evaluate a witness's credibility and resolve any conflicts in the evidence presented. *See Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996). The evidence is not insufficient because a complainant confuses the types of sex acts and when they occurred—courts give wide latitude to testimony given by child victims of sexual abuse. *See Ketchum v. State*, 199 S.W.3d 581, 590 (Tex. App.—Corpus Christi-Edinburg 2006, pet. ref'd) (the victim's description of what happened to her need not be precise, and she is not expected to express herself at the same level of sophistication as an adult).

The jury heard I.W.'s testimony and was able to view the interview of I.W. by Jones. Any conflicts between what Jones said I.W. told her, what I.W. actually told her, and what I.W. testified to at trial were for the jury to resolve. Likewise, I.W.'s inability to give exact dates and any inaccuracies in her testimony were before the jury for its consideration, as was I.W.'s delay of several weeks before making an outcry and her failure to disclose the anal sex in her interview with Jones. I.W.'s testimony established that appellant penetrated her mouth with his sexual organ and caused her sexual organ to contact his sexual organ. *See* Tex. Code Crim. Proc. Ann. art. 38.07(a) (West 2013) (the testimony of a child victim alone is sufficient to support a conviction for sexual assault); *Villalon v. State*, 791 S.W.2d 130, 134 (Tex. Crim. App. 1990) (child victim's unsophisticated terminology alone established element of penetration beyond a reasonable doubt); *Jensen v. State*, 66 S.W.3d 528, 534 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd) (testimony of child victim alone is sufficient to support conviction for

aggravated sexual assault).  Viewing the evidence in the light most favorable to the verdict, the jury could have found the elements of both offenses beyond a reasonable doubt.  *Brooks*, 323 S.W.3d at 895.  Appellant's first issue is overruled.

## II.     INEFFECTIVE ASSISTANCE

Appellant's second issue asserts a claim for ineffective assistance. Appellant complains that counsel failed to object to the evidence of tattoos on his body.

We examine claims of ineffective assistance of counsel under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, appellant must prove that his trial counsel's representation was deficient, and that the deficient performance was so serious that it deprived him of a fair trial.  *Id.* at 687.  Counsel's representation is deficient if it falls below an objective standard of reasonableness.  *Id*. at 688. This deficiency will only deprive appellant of a fair trial when counsel's performance prejudices appellant's defense.  *Id*. at 691–92. To demonstrate prejudice, appellant must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id*. at 694.  Failure to make the required showing of either deficient performance or sufficient prejudice defeats the claim of ineffectiveness. *Id*. at 697. This test is applied to claims arising under both the United States and Texas Constitutions.  *See Hernandez v. State*, 726 S.W.2d 53, 56–57 (Tex. Crim. App. 1986).

Our review of defense counsel's performance is highly deferential, beginning with the strong presumption that the attorney's actions were reasonably professional and were motivated by sound trial strategy.  *See Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994). When the record is silent as to trial counsel's strategy, we will not conclude that appellant received ineffective

assistance unless the challenged conduct was "so outrageous that no competent attorney would have engaged in it." *See Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005). Rarely will the trial record contain sufficient information to permit a reviewing court to fairly evaluate the merits of such a serious allegation. *See Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002). In the majority of cases, the appellant is unable to meet the first prong of the Strickland test because the record on direct appeal is underdeveloped and does not adequately reflect the alleged failings of trial counsel. *See Mata v. State*, 226 S.W.3d 425, 430 (Tex. Crim. App. 2007).

In this case appellant did not file a motion for new trial alleging ineffective assistance of counsel or develop a record of counsel's reasons for his actions. Therefore, in addressing this issue, the record is silent as to counsel's strategy.

The record reflects that at the beginning of trial the trial court granted appellant's motion excluding photographs depicting appellant's tattoos. Subsequently, I.W. testified that appellant has a tattoo on his left wrist that is her name. The State then moved to introduce a photograph of that tattoo. Defense counsel questioned I.W. on voir dire and objected to its admission on the grounds she lacked personal knowledge of the photograph. The objection was overruled and the exhibit was admitted into evidence and published to the jury. The State then asked for appellant to show the same tattoo to the jury. It was at that point defense counsel stated, "no objection."

As set forth above, when appellant testified, he showed the jury the tattoo again. He testified that he had the names of all his children tattooed on his body and showed the jury two other tattoos bearing the names of his other children. According to appellant, he already had a tattoo that included I.W.'s last name and

10

he put her first name in front of it because her mother asked; it was done about "a year ago."

The jury had already heard testimony from I.W. that appellant had her name tattooed on his wrist and had seen a photograph of it. Counsel did not object to the jury seeing the actual tattoo. Once the jury learned of the tattoo and had the picture of it, counsel's strategy might have been to show the jury that appellant's tattoo of I.W.'s name had no special significance. In light of the context in which counsel failed to object, we cannot say counsel's action was unreasonable or outrageous. Because appellant has not established the first prong of *Strickland,* we overrule his second issue.

## III.   CONCLUSION

Having overruled both of appellant's issues, we affirm the trial court's judgment in each case.



/s/     Tracy Christopher
Justice



Panel consists of Justices Christopher, Jamison, and McCally.
Do Not Publish — Tex. R. App. P. 47.2(b).